Filed 2/18/22  P. v. Ruether CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JEFFREY WAYNE RUETHER,<br><br>Defendant and Appellant. | F080021<br><br>(Super. Ct. No. F18906059)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Brian F. Alvarez, Judge.

David Y. Stanley, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda M. Cary and Ian Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Jeffrey Wayne Ruether was convicted of crimes arising from the sexual abuse of his daughter, Jane Doe.  On appeal, he contends (1) the trial court erred in

instructing the jury with CALCRIM No. 1190, (2) the trial court erred in instructing the jury with CALCRIM No. 225 rather than CALCRIM No. 224, and (3) the trial court's errors were cumulatively prejudicial. We affirm.

## PROCEDURAL SUMMARY

On September 25, 2018, the Fresno County District Attorney charged defendant with two counts of oral copulation of a person under 14 years of age and more than 10 years younger than defendant (Pen. Code, former § 288a, subd. (c)(1); counts 1 & 2) and two counts of a lewd act upon a child (§ 288, subd. (a); counts 3 & 4). The information alleged that all counts occurred between June 14 and June 23, 2016. Defendant pleaded not guilty to all counts.

The jury found defendant guilty on all counts. The trial court sentenced defendant to a determinate aggregate term of 12 years, comprised of six years on count 1, and two consecutive years each on counts 2, 3, and 4.

On September 17, 2019, defendant filed a notice of appeal.

## FACTS

The four offenses charged in this case occurred in a hotel room in Fresno between June 14 and June 23, 2016, when Jane was 13 years old. Defendant, however, began sexually abusing Jane when she was seven or eight years old. Thus, the prosecution presented not only evidence of the charged offenses, but also evidence of defendant's prior uncharged acts against Jane. Additionally, the prosecution presented evidence of defendant's prior uncharged acts against another girl named A.Q.

### *Jane's Trial Testimony*

Defendant had custody of Jane from the time she was three years old. Over the course of Jane's childhood, defendant and Jane lived together in multiple states, including Tennessee, Texas, Washington, and California.

Jane, who was 16 years old at the time of trial, testified that defendant would "touch on my private areas and make me do things … in his private areas" for "all [her] life." Jane

2.

testified that the first incidents of abuse occurred when she and defendant were living in Tennessee. During these incidents, defendant touched Jane's vagina with his fingers, touched her breasts, put his penis on Jane's mouth and made her "go up and down," and put his tongue and mouth on Jane's breasts and vagina. The touching occurred often, at least once a week and possibly every day. Defendant would say, "Don't tell nobody." While in Tennessee, Jane told her friend's mother about defendant's touching, but later told the friend's mother she was not telling the truth. Jane recanted her story because she was afraid she would not have a place to live if she told the truth about defendant.

On cross-examination, Jane testified that when she was eight years old and living in Tennessee, she was raped by a teenager named J.T. When she was interviewed about the rape by the police, she did not tell the police about the abuse by defendant. J.T. pled guilty to the rape. After the rape, Jane saw a counselor for two years and did not tell the counselor about the abuse by defendant because she was afraid she would no longer have anyone to take care of her.

Defendant and Jane then moved to Washington. In Washington, defendant would touch Jane's vagina, put his mouth on her vagina, and have her put her mouth on his penis. Defendant and Jane moved back to Tennessee and the same touching continued there, but on fewer occasions.

When Jane was 13 years old, she and defendant briefly stayed in a hotel in Fresno with Jane's mother. When defendant would ask Jane to "make him tingle," this meant to put her mouth on his penis. When defendant would ask Jane if he could make her tingle, this meant to put his mouth on her private area. While they were alone at the hotel, defendant repeatedly asked Jane to put her mouth on his penis, to which Jane responded "no." Defendant then put his hand on his penis and "went up and down" in front of Jane.

While Jane's mother was present in the hotel room, defendant called Jane into the bathroom when he was taking a shower. He put Jane's hand on his penis, told her to

3.

squeeze, and Jane complied. Later, defendant touched Jane's thigh and armpit while they were on the bed.

Jane's mother went to the hospital because she was in pain. While in the hospital, the mother asked Jane whether defendant touched her and Jane said "yes." The mother told a nurse, who told a social worker, and then the police were called. Jane was interviewed by two police officers. Jane did not tell anyone else about the touching sooner because she was afraid she would lose her home, food, and love from defendant.

### *Jane's Forensic Interview*

A forensic interview was scheduled for August 17, 2016, by Fresno Police Officer Veronica Salinas-Cardinale, a detective on the sexual assault unit. A video recording of the interview was played for the jury and each juror was given a copy of the transcript of the interview.

In the interview, Jane said defendant did bad "stuff" to her and made her do "stuff" to him more than 10 times. Jane said she was in the fourth through sixth grades when she and defendant lived in Tennessee, and she was seven or eight years old the first time the abuse happened. At that time, defendant pulled down Jane's pants and underwear, held onto her knees so she could not move, and performed oral sex on her. Defendant then attempted to put his penis into Jane's vagina and "white stuff" came out of his penis. Defendant would also suck on Jane's breasts with his mouth and rub his fingers on her private area. Defendant would force Jane to perform oral sex on him. This continued to happen once or twice a week and sometimes every day.

When Jane was in the sixth grade, she and defendant moved to Washington. Defendant performed oral sex on her, forced her to perform oral sex on him, and touched and sucked on her breasts once or twice a week while they lived in Washington.

Defendant and Jane moved to Auberry, California when Jane was still in the sixth grade. Defendant would squeeze Jane's breasts during this time. Defendant would also squeeze Jane's bottom regularly.

4.

Jane explained that in 2016, when she was 13 years old, she was staying in a hotel room with her mother and defendant in Fresno.  In the hotel room, defendant asked Jane if he would make her "tingle," to which Jane said "no."  Defendant asked Jane if she wanted to make him tingle, to which Jane again said "no."  Defendant then took off Jane's shorts and underwear and licked her private area.  Defendant took his pants off and exposed himself and asked Jane if she wanted to make him tingle.  Defendant pushed Jane's head toward his penis and his penis touched the inside of Jane's lips.  After defendant took a bath, he asked Jane to play with his penis, to which Jane replied "no."  Defendant made Jane squeeze his penis with her hand and move her hand up and down on his penis.  Defendant had an erection.  Later, defendant rubbed his hand on Jane's private area and breasts under her clothes when they were on the bed.  While Jane was with her mother at the hospital, she told her mother what had happened with defendant.

Officer Salinas-Cardinale testified she observed Jane's forensic interview as part of the forensic team.  Salinas-Cardinale testified Jane stated in the interview that in the hotel room in Fresno, defendant performed oral sex on her, forced her head and lips to his penis, made her touch his penis with her hand, and touched her breasts and vagina under her clothes.

### Child Sexual Abuse Accommodation Syndrome (CSAAS)

David Love, the executive director of a counseling services organization, testified that CSAAS provides information on how abused children typically react to abuse and why they are often not believed about the abuse.  Love did not receive any information about defendant's case at any time prior to testifying or during his testimony and he did not meet Jane at any time.

Love explained that CSAAS has five classifications:  secrecy, helplessness, entrapment and accommodation, delayed reporting, conflicting and/or unconvincing disclosure, and retraction.  Regarding secrecy, children are afraid to tell adults about abuse due to a number of reasons, such as coercion or manipulation on the part of the abuser.

Helplessness describes the child's inability to tell an adult about the abuse due to their relationship with the abuser. For example, in the case of a single parent abuser, the child may have no one else to tell about the abuse and the parent may be their sole provider. Entrapment and accommodation means that when the abuse happens repeatedly, the child may accept the situation and find a way to cope. It is common for children to delay disclosure, unconvincingly disclose the abuse, or forget the details of the abuse. Love testified that a child abuse victim may testify to different aspects of the abuse during different interviews and may provide conflicting information. It is common for children to retract part of their testimony during different interviews, often stating that they cannot remember certain details of their previous testimony. CSAAS is not a diagnostic tool; rather, it assumes that the child in question has been abused.

### *Defendant's Prior Uncharged Acts against A.Q.*

A.Q., a 22-year-old former neighbor of defendant's, lived at an apartment complex in Clovis, California. Defendant was a family friend and would spend time with A.Q. and her family when A.Q. was a girl. When A.Q. was 12 years old, defendant put his hands down her pants and swimsuit and touched the top of her vulva. The police came to the apartment complex to investigate another matter and A.Q. told them about the touching.

### *Defense Case*

#### *Shannon Griffith*

Shannon Griffith, a corporal with the Clovis Police Department, interviewed A.Q. about the incident involving defendant when she was 12 years old. A.Q. told Griffith that defendant did not touch her inappropriately. A.Q. told her that if defendant had touched her bathing suit, it was for the purpose of telling her to cover herself and that defendant pulled on her shorts as part of a "pantsing" game. A.Q. told her that defendant rubbed her belly when she was complaining of menstrual cramps and that once defendant put his hand inside the waistband of her shorts. Defendant would sometimes tickle her and a picture was taken where defendant was giving her a "bear hug."

6.

*Lloyd Flores*

Fresno Police Officer Lloyd Flores interviewed Jane at the hospital. Jane freely and calmly gave information to Flores and showed him the places on her body that defendant touched her. Jane told Flores that while in the hotel room, defendant made her stimulate his penis with her mouth, laid her on the bed, rubbed his penis up and down on her vagina, but did not ejaculate. On cross-examination, Flores testified that Jane said defendant used the word "tingle" before he put his penis in her mouth.

*Defendant*

Defendant testified on his own behalf. Defendant stated that he and Jane lived in various states and lived with different people in each state. Defendant would regularly supervise the children who lived in the Clovis apartment complex while they were swimming, but he never touched A.Q. inappropriately. While in the pool with A.Q., he commented to her that she had shaved her legs.

Defendant denied doing any of the acts of which Jane accused him and he stated he did not inappropriately touch her. Jane brought defendant his underwear after he took a shower in the Fresno hotel room, but the shower curtain was drawn. After Jane accused defendant of abusing her, CPS became involved and parental rights hearings were held. Defendant voluntarily terminated his parental rights, reasoning that Jane would be safer elsewhere because he was homeless.

## DISCUSSION

I.     CALCRIM No. 1190

Defendant contends the trial court erred when it instructed the jury with CALCRIM No. 1190—which states that "[c]onviction of a sexual assault crime may be based on the testimony of a complaining witness alone"—because it impermissibly allowed the jury to give Jane's testimony special weight. Defendant argues that the jury would have understood that no corroboration was needed for Jane's testimony even without the instruction. He asserts that CALCRIM No. 1190 improperly lightened the prosecution's burden of proof,

7.

violating his Fourteenth Amendment rights. The People counter that defendant's contention has been squarely rejected by relevant California Supreme Court law in *People v. Gammage* (1992) 2 Cal.4th 693 (*Gammage*). We agree with the People.

A.    *Background*

At trial, the court instructed the jury with both CALCRIM Nos. 301 and 1190. CALCRIM No. 301 instructs: "The testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence." And, as noted above, CALCRIM No. 1190 instructs: "Conviction of a sexual assault crime may be based on the testimony of a complaining witness alone."

In closing argument, the prosecutor stated:

> "I also want you to keep in mind that the conviction of a sexual assault crime may be based on the testimony of the complaining witness alone. So, what this means, is that a conviction can be based on [Jane's] testimony alone. You do not need any physical corroborating evidence. You don't need a witness who saw it occur. If you believe beyond a reasonable doubt what [Jane] told you on that witness stand, that is all you need."

In response, defense counsel argued:

> "The [prosecutor] had mentioned that there is a law that says the [testimony] of only one witness can prove the crime of a sexual assault. And that is true. But when that is the case, that testimony better be rock solid. It doesn't change the burden at all. The burden is still proof beyond a reasonable doubt."

B.    *Standard of Review*

"Errors in jury instructions are questions of law, which we review de novo." (*People v. Russell* (2006) 144 Cal.App.4th 1415, 1424; *People v. Guiuan* (1998) 18 Cal.4th 558, 569.) " 'When an appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner.' " (*People v. Jennings* (2010) 50 Cal.4th 616, 677; *People v. Paysinger* (2009) 174 Cal.App.4th 26, 30 ["On review, we

8.

examine the jury instructions as a whole, in light of the trial record, to determine whether it is reasonably likely the jury understood the challenged instruction in a way that undermined the presumption of innocence or tended to relieve the prosecution of the burden to prove defendant's guilt beyond a reasonable doubt."].) We presume the jury understood and followed the instructions. (See *People v. Silveria and Travis* (2020) 10 Cal.5th 195, 245; *In re Loza* (2018) 27 Cal.App.5th 797, 800 [We "presume jurors are intelligent people capable of understanding and correlating all of the instructions they were given."].) And, if possible, we interpret the instructions "so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation." (*People v. Laskiewicz* (1986) 176 Cal.App.3d 1254, 1258.)

### C. Law

"The proof of the elements of [a sexual assault] often turns on a credibility contest between the accused and the accuser alone, since the act is most often committed in private. [Citation.] Permitting a jury to operate under the misconception corroboration is required would put the value of the victim's testimony on a level below that of the defendant's testimony, credibility aside, and that is not the law." (*Gammage*, *supra*, 2 Cal.4th at p. 697.)

In *Gammage*, the jury was instructed with CALJIC No. 10.60[1] (the predecessor of CALCRIM No. 1190) and CALJIC No. 2.27[2] (the predecessor of CALCRIM No. 301).[3] (*Gammage*, *supra*, 2 Cal.4th at pp. 696–697.) The defendant argued that the two

---

[1] " 'It is not essential to a conviction of a charge of rape that the testimony of the witness with whom sexual intercourse is alleged to have been committed be corroborated by other evidence.' " (*Gammage, supra,* 2 Cal.4th at pp. 696–697.)

[2] " 'Testimony as to any particular fact which you believe given by one witness is sufficient for the proof of that fact. However, before finding any fact *required to be established by the prosecution* to be proved solely by the testimony of such a single witness, you should carefully review all the testimony upon which the proof of such fact depends.' " (*Gammage, supra,* 2 Cal.4th at p. 696.)

[3] Cases addressing the CALJIC instructions are generally applicable to the CALCRIM instructions. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1171 & fn. 12.)

9.

instructions, when given together, "unconstitutionally 'create[] a preferential credibility standard for the complaining witnesses.' " (*Id.* at p. 700.)

The Supreme Court rejected this contention, explaining that "[a]lthough the two instructions overlap to some extent, each has a different focus." (*Gammage*, *supra*, 2 Cal.4th at p. 700.) The court concluded that CALJIC No. 2.27 "focuses on how the jury should evaluate a fact (or at least a fact required to be established by the prosecution) proved solely by the testimony of a single witness." (*Gammage, supra,* at p. 700.) On the other hand, CALJIC No. 10.60 "declares a substantive rule of law, that the testimony of the complaining witness need not be corroborated. It is given with other instructions on the legal elements of the charged crimes." (*Gammage, supra,* at pp. 700–701.) "The one instruction merely suggests careful review when a fact depends on the testimony of one witness. The other tells the jury there is no legal corroboration requirement. Neither eviscerates or modifies the other." (*Id.* at p. 701.) The instructions do not give the victim's testimony undue prominence and neither do they " 'dilute[] the "beyond a reasonable doubt" standard.' " (*Ibid.*) The court concluded: "[T]here remains a continuing vitality in instructing juries that there is no legal requirement of corroboration. Further, even if we were to assume, which we do not, that all juries are aware of the no-corroboration requirement, or would glean it from CALJIC No. 2.27 itself, no harm is done in reminding juries of the rule." (*Ibid.*) Moreover, juries are also instructed that the prosecution must prove its case beyond a reasonable doubt. "This places a heavy burden of persuasion on a complaining witness whose testimony is uncorroborated. CALJIC No. 10.60 does not affect this instruction but, in the words of *People v. Hollis* [(1991)] 235 Cal.App.3d [1521,] 1526, when all the instructions are given, 'a balance is struck which protects the rights of both the defendant and the complaining witness.' " (*Ibid.*; see *People v. Adames* (1997) 54 Cal.App.4th 198, 210 ["[W]hen viewed in context, [CALJIC Nos. 2.27 and 10.60] do not elevate the credibility of the victim witness or that of other witnesses. It is settled that the giving of both instructions is appropriate."].)

10.

*D.    Analysis*

The People correctly rely on *Gammage* in refuting defendant's contentions. *Gammage* clearly stated that each CALJIC Nos. 2.27 and 10.60, which are analogous to CALCRIM Nos. 301 and 1190 given in this case, each has a different focus—factual and legal—and therefore both can be given without danger of placing undue weight on a complaining witness' testimony.  (*Gammage*, *supra*, 2 Cal.4th at p. 700–701.)  And even when the jury is already aware of the "no-corroboration requirement," there is no harm in "reminding [the jury] of the rule."  (*Id*. at p. 701.)  Further, the prosecution still carries the heavy burden of proving its case beyond a reasonable doubt and CALCRIM No. 1190 does not lighten this burden.  (*Gammage, supra,* at p. 701.)

Defendant argues that the jury in this case would have already known not to adhere to a "long-since-discarded legal concept[]" that corroboration of a sexual assault victim's testimony is necessary for a conviction.  Thus, he urges us to follow the concurrences in *Gammage*, which concluded CALJIC No. 10.60 was outdated and unnecessary, and overrule *Gammage*.  We, however, are bound to follow the majority in *Gammage* and have no authority to overrule the Supreme Court's decisions.  (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ["Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction.  It is not their function to attempt to overrule decisions of a higher court."].)  Accordingly, we conclude the trial court did not err in instructing the jury with both CALCRIM Nos. 301 and 1190.

II.    CALCRIM Nos. 224 and 225

Defendant contends the trial court erred when it gave CALCRIM No. 225 rather than CALCRIM No. 224.  Specifically, defendant first contends CALCRIM No. 225 was not proper in this case because his intent was not at issue.  Secondly, he contends CALCRIM No. 224 should have been given instead because the prosecution's case relied "substantially on circumstantial evidence" to prove defendant committed the acts, in the form of Love's

11.

testimony about CSAAS, and Jane's and A.Q.'s testimony about defendant's prior uncharged acts.

We conclude the trial court did not err. And, if it did, any error was harmless.

*A.*   *Background*

During discussion of jury instructions, the defense requested CALCRIM No. 224, which provides:

"Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.

"Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

The prosecution, on the other hand, requested CALCRIM No. 225, which provides:

"The People must prove not only that the defendant did the acts charged, but also that he acted with a particular intent. The instruction for each crime explains the intent required.

"A defendant's intent may be proved by circumstantial evidence.

"Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.

"Also, before you may rely on circumstantial evidence to conclude that the defendant had the required intent, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required intent and mental state. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports a finding that the defendant did have the required intent and another reasonable conclusion supports a finding that

12.

the defendant did not, you must conclude that the required intent was not proved by the circumstantial evidence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

In considering whether to instruct with CALCRIM No. 224 or No. 225, the trial court stated that "direct testimony with regards to the actus reus … came in through [Jane]." Defense counsel argued that Love's testimony constituted circumstantial evidence that defendant committed the crimes. The court stated that Love's testimony served to "disabuse [the jury] of any misconceptions they may have with regards to how an abuse victim might … act." The prosecutor argued that Love's testimony was not evidence of defendant's guilt, but rather was evidence to assist the jury in accessing Jane's credibility and her actions in reporting the abuse.

The court denied the defense motion to instruct with CALCRIM No. 224, stating that "the specific instruction with Mr. Love tells them that they're not to consider evidence that the charge is true." The court stated it would give CALCRIM No. 225 because it dealt with "the mental state required [of defendant]."

The trial court did ultimately instruct the jury with CALCRIM No. 225, and then also explained how the jury could use Love's testimony:

> "David Love's testimony about Child Sexual Abuse Accommodation Syndrome is not evidence that the Defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not [Jane's] conduct was not inconsistent with the conduct of someone who has been molested."

In closing argument, the prosecutor argued that circumstantial evidence, such as the circumstances surrounding the acts, established defendant's intent for the lewd and lascivious acts in counts 3 and 4. As to count 3—which the prosecutor elected as occurring when defendant called Jane into the bathroom at the hotel and made her touch his penis— the prosecutor argued:

> "The Defendant committed the act with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or the child's. So,

13.

how do we know what the defendant's intent was when he made his 13-year-old daughter masturbate him? I think commonsense tells you what his intent was. The surrounding circumstances tell you what his intent was. He tells her he wants her to play with his penis. He then puts her hand on his penis and makes her masturbate him. Why does any person want to have themselves stimulated manually? It's not for a medical purpose. It's not to help him with any health issues. It is for him to get some sexual gratification, some sexual release. And to him, it doesn't matter that it's his biological daughter doing it. He just wants that sexual desire fulfilled. That is the only reason to have a child touch his penis. There's no other explanation. And I think anybody would be hard pressed to come up with a legitimate explanation for that conduct."

As to count 4—which the prosecutor elected as occurring when defendant touched Jane's vagina while on the bed in the hotel—the prosecutor argued:

"You have to have the intent, what is the intent when he did that act [touching Jane's vagina]? He needs to have the intent of arousing, appealing to, or gratifying the lusts, passions, or sexual desires of himself or the child …. This isn't an accidental touching. This isn't a touching where they're maybe playing—playing around rough, wrestling and he accidentally touches her vagina. If you accidentally touch her vagina, you're not going to go inside her clothing. You're not going to go inside her shorts. And you're not going to go inside her underwear. You're not going to rub her vagina up and down if this is an accidental touching or a nonsexual touching. He had not had enough that day. He still wanted more sexual acts from his daughter. So, he took the next opportunity he had and while they were playing on the bed, he puts his hand in her vagina and tries to stimulate her vagina for his own sexual desires. He was not trying to check her vagina because she had a rash and she was a small baby. He wasn't trying to check her out because she's complaining of pain or she needs some kind of assistance. He touched her vagina because he treated his daughter like a sexual object."

Regarding defendant's prior uncharged acts, the prosecutor argued:

"[Y]ou may consider this evidence [of prior uncharged acts] first, only if the People have proved by a preponderance of the evidence that the Defendant, in fact, committed the uncharged offenses. Now, a fact is proved beyond a preponderance of the evidence if you conclude that it's more likely than not that the fact is true. So, this is a different standard than beyond a reasonable doubt. If you decide that Defendant committed the uncharged acts, you may, but are not required to conclude from that evidence that the Defendant was disposed of or inclined to commit sexual offenses. And based on that

14.

decision, conclude that he likely committed the charged crimes.  [¶] … [¶] … [Y]ou can use the fact the defendant touched [A.Q.], that the defendant abused [Jane] for years and years in all of these various states to determine that defendant is disposed to commit sexual acts and that he committed these acts that are charged.”

Finally, regarding Love's testimony, and how the jury could use that evidence, the prosecutor argued:

“You heard testimony about the Child Sexual Abuse Accommodation Syndrome or CSAAS.  And you were told yesterday that David Love's testimony about CSAAS is not evidence that the Defendant committed any of the charged offenses against him.  You can only consider the evidence in deciding whether or not [Jane's] conduct was not inconsistent with the conduct of someone who had been molested….  In plain terms, you can't use David Love's testimony to say that, well, [Jane] reported late, and there were some inconsistencies about timelines or what happened first, so therefore, the Defendant must be guilty.  You cannot use it that way.  It is no evidence whatsoever that the Defendant is guilty.  Instead, this is about evaluating [Jane's] conduct, [Jane's] credibility and did she act consistent with what is typically seen.”

In response, defense counsel argued:

“I want to talk a second about circumstantial evidence.  It's, um, an instruction [you got].  And what circumstantial evidence says is basically that there's a piece of evidence and it can have two reasonable conclusions, meaning you can reach two different directions with that piece of evidence and they're both reasonable, you have to go in the direction of finding [defendant] innocent.  Not guilty.  It doesn't matter if—if the evidence is much stronger towards guilt than innocence, the standard, the test is—are both of them reasonable?  If both are reasonable, you have to go with the one that points towards innocence.”

In rebuttal, the prosecution argued:

“This isn't a case about circumstantial evidence.  [Jane] told you what happened to her.  That is direct evidence.  That is not circumstantial evidence. The only circumstantial evidence you have goes to Defendant's intent.  What was his intent when he did what he did?  What was his intent when he touched [Jane]?  What was his intent when [Jane] touched him?  That's the circumstantial evidence, because we don't know, you can't get into somebody's mind and know what they're thinking at the time.  It's impossible. So, you look at the circumstances surrounding it.  That's where the

circumstantial evidence comes into play.  And with circumstantial evidence, you only accept reasonable conclusions and you disregard any conclusions that are unreasonable.  And there's only one reasonable conclusion in regards to the Defendant's intent when he touched his daughter."

### B.     Standard of Review

As we have explained above, "[e]rrors in jury instructions are questions of law, which we review de novo." (*People v. Russell*, *supra*, 144 Cal.App.4th at p. 1424.)

### C.     Law

"[T]he trial court must instruct on the general principles of law relevant to the issues raised by the evidence.  [Citations.]  The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." (*People v. St. Martin* (1970) 1 Cal.3d 524, 531.)

" '[D]irect evidence' means evidence that directly proves a fact, without an inference or presumption, and which in itself, if true, conclusively establishes that fact." (Evid. Code, § 410.)  Direct evidence "stands on its own." (*People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1187.)  Circumstantial evidence, on the other hand, "involves a two-step process— first, the parties present evidence and, second, the jury decides which reasonable inference or inferences, if any, to draw from the evidence." (*Ibid.*)

"CALCRIM Nos. 224 and 225 provide essentially the same information on how the jury should consider circumstantial evidence, but CALCRIM No. 224 is more inclusive." (*People v. Samaniego*, *supra*, 172 Cal.App.4th at p. 1172.)  "The only difference between the two instructions is that [CALCRIM No. 225] focuses the jury's attention on the sufficiency of the circumstantial evidence to prove specific intent or a mental state, while [CALCRIM No. 224] broadly covers all circumstantial evidence." (*People v. Burch* (2007) 148 Cal.App.4th 862, 872 [discussing CALJIC Nos. 2.01 and 2.02, predecessors to CALCRIM Nos. 224 and 225].)  CALCRIM No. 225 is to be used in place of CALCRIM No. 224 "when the defendant's specific intent or mental state is the only element of the

offense that rests substantially or entirely on circumstantial evidence." (*People v. Honig* (1996) 48 Cal.App.4th 289, 341 [discussing CALJIC Nos. 2.01 and 2.02].) Likewise, the use notes to CALCRIM No. 225 state that "[i]f other elements of the offense also rest substantially or entirely on circumstantial evidence, do not give this instruction. Give CALCRIM No. 224." (Use Note to CALCRIM No. 225 (2011); see *People v. Marshall* (1996) 13 Cal.4th 799, 849; *People v. Hughes* (2002) 27 Cal.4th 287, 347.)

D.      *Analysis*

1.      *Intent Evidence*

Defendant's contention that his intent was not at issue is plainly erroneous because to prove the lewd and lascivious acts alleged in counts 3 and 4, the prosecutor was required to prove beyond a reasonable doubt that defendant harbored a specific intent—that is, that he "willfully and lewdly commit[ed] any lewd or lascivious act … upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child …."[4] (§ 288, subd. (a).) The prosecution used direct evidence to prove that defendant willfully and lewdly committed lewd or lascivious acts through the direct evidence of Jane's testimony and her forensic interview. The prosecution also proved that Jane was under the age of 14 years and at least 10 years younger than defendant through the direct evidence of Jane's testimony of her date of birth and a police officer's testimony of defendant's date of birth. Accordingly, the remaining element that needed to be proven by the prosecution was defendant's intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or Jane. (§ 288, subd. (a).)

---

[4]      Only general intent was required for counts 1 and 2. "A violation of [former 288a, subd. (c)(1)] is not a crime requiring a specific intent. To render a person guilty [of oral copulation] it is not essential to a conviction that the proof should show such person to have entertained any intent to violate the law. [Citation.] It is sufficient that he intentionally committed the forbidden act." (*People v. Brocklehurst* (1971) 14 Cal.App.3d 473, 476.)

17.

The prosecutor argued in closing that the circumstances surrounding the acts demonstrated that defendant had the specific intent to commit lewd and lascivious acts. For example, the prosecutor argued that the circumstances did not suggest an innocent explanation for the touchings, such as an accident, or a medical purpose, such as checking for a rash or pain. Rather, the prosecutor argued that the circumstances suggested only that defendant engaged in the touchings for sexual gratification. The circumstances that day in the hotel constituted circumstantial evidence of defendant's specific intent, warranting the CALCRIM No. 225 instruction.

### 2. CSAAS Evidence

We also reject defendant's contention that Love's testimony constituted circumstantial evidence of his guilt. Before Love testified, the trial court admonished the jury that Love's testimony about CSAAS was *not* evidence that defendant committed the crimes charged, stating that "[y]ou may consider this evidence only in deciding whether or not [Jane's] conduct was not inconsistent with the conduct of someone who has been molested."

Further, the trial court specifically instructed the jury that Love's testimony was not to be considered as evidence of defendant's guilt, but rather was to be considered only in determining Jane's credibility as it related to her behavior after the abuse occurred, i.e., waiting to report the abuse and providing varying details between her forensic interview and trial testimony.

Testimony regarding CSAAS "may be used to negate the inference (i.e., to dispel the 'misconceptions' discussed in [*People v. Bledsoe* (1984) 36 Cal.3d 236[5]]) that an individual who acts in conformity with the syndrome has not been raped or molested, while such

---

[5] In *Bledsoe*, the Supreme Court concluded that evidence of rape trauma syndrome, similar to CSAAS, cannot be admitted to prove that a defendant committed the crime, but can only be admitted to rebut misconceptions about the presumed behavior of rape victims. (*People v. Bledsoe, supra*, 36 Cal.3d at p. 251.)

18.

evidence may not be used to prove the person *was* raped or molested." (*People v. Wells* (2004) 118 Cal.App.4th 179, 193.) A court "handle[s] [CSAAS testimony] carefully and correctly" where it instructs a jury that CSAAS evidence may not be used to determine guilt, but rather may only be used to dispel misconceptions about the way an abuse victim is presumed to act. (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1745.)

Here, the court instructed the jury properly on how to consider the CSAAS evidence, stating that the testimony was not to be used as evidence of defendant's guilt. Defendant has presented no evidence that the jury misinterpreted the court's instructions and considered Love's testimony as circumstantial evidence of his guilt. We presume that the jury followed the instructions as given. (*People v. Silveria and Travis*, *supra*, 10 Cal.5th at p. 245.) Accordingly, defendant's contention that Love's testimony was circumstantial evidence of his guilt fails. The admission of the CSAAS evidence did not dictate that CALCRIM No. 224 be given.

### 3. Prior Uncharged Acts Evidence

Lastly, we reject defendant's contention that evidence of his prior uncharged acts—A.Q.'s testimony of the pool incident and Jane's testimony of abuse prior to the hotel room incidents—required instruction with CALCRIM No. 224. Although evidence of the prior uncharged acts was indeed presented as circumstantial evidence that defendant committed the current charged crimes, the prosecution did not *substantially* rely on this evidence to prove these crimes.

"[E]vidence that [a defendant] committed other sex offenses is … circumstantially *relevant* to the issue of his disposition or propensity to commit these offenses." (*People v. Falsetta* (1999) 21 Cal.4th 903, 915.) Here, the bulk of the prosecution's evidence of the acts underlying defendant's current charges relied on the direct evidence of Jane's trial testimony and forensic interview. Evidence of defendant's uncharged acts served to bolster the prosecution's case but was not relied upon substantially to prove the prosecution's case, especially considering that the charged acts were limited to the 2016 Fresno hotel room

incidents. Accordingly, because defendant's specific intent was the only element of the lewd and lascivious charge that rested substantially on circumstantial evidence, the court did not err when it instructed with CALCRIM No. 225. (*People v. Honig*, *supra*, 48 Cal.App.4th at p. 341.)

      E.     *Harmless Error*

Even if the court erred in instructing with CALCRIM No. 225 rather than 224, any error was harmless. Ordinarily, instructional error is assessed under the *Watson* reasonable probability standard. (*People v. Watson* (1956) 46 Cal.2d 818; *People v. Flood* (1998) 18 Cal.4th 470, 490.) Only where jury instructions relieve "the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violate the defendant's due process rights under the federal Constitution" does the harmless error standard of *Chapman v. California* (1967) 386 U.S. 18 apply. (*Flood*, at p. 491.) Here, the alleged instructional error did not relieve the prosecution of proving every element of the charged crimes beyond a reasonable doubt. On the contrary, CALCRIM No. 225 plainly states that the prosecution must prove each element of the charged crimes beyond a reasonable doubt. Therefore, the *Watson* harmless error standard, not the more stringent *Chapman* standard, applies. Under the *Watson* standard, an error was harmless unless defendant can show that it is "reasonably probable that a result more favorable to [him] would have been reached in the absence of the error." (*Watson*, *supra*, 46 Cal.2d at p. 836.)

Although CALCRIM No. 225 is less inclusive than CALCRIM No. 224 because it instructs the jury specifically on the use of circumstantial evidence to prove a mental state, it also contains the more general language that "[b]efore you may rely on circumstantial evidence to conclude that a fact necessary to find defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt." This general instruction in CALCRIM No. 225 regarding circumstantial evidence reminded the jury that all elements of the charged offenses must have been proven beyond a reasonable doubt.

Moreover, the jury heard argument from defense counsel regarding circumstantial evidence that tracked with the language of CALCRIM No. 224. Defense counsel stated that where circumstantial evidence leads to two reasonable conclusions, the jury must follow the explanation most favorable to the defendant. The prosecution did not object to this argument.

Further, as stated previously, the jury was specifically instructed not to consider Love's testimony as proof of his guilt. Accordingly, neither CALCRIM No. 224 nor 225, both of which relate to circumstantial evidence of guilt, correlated to Love's testimony. Therefore, the giving of CALCRIM No. 225 rather than 224 would not have impacted the way the jury analyzed Love's testimony.

Finally, the jury was instructed to consider the uncharged acts evidence under the specific instruction of CALCRIM No. 1191A. CALCRIM No. 1191A explicitly instructed the jury: "If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of lewd and lascivious acts and oral copulation on a child under 14 years." The scope of CALCRIM No. 1191A is narrower than CALCRIM No. 225. Accordingly, it is not likely that the jury applied the more general instruction of CALCRIM No. 225 rather than the specific instruction of CALCRIM No. 1191A regarding the uncharged acts.

Defendant has failed to demonstrate that a result more favorable to him would have been reached had the court instructed with CALCRIM No. 224. Therefore, any error in instructing with CALCRIM No. 225 rather than CALCRIM No. 224 was harmless.

III.    CUMULATIVE PREJUDICE

Defendant argues that he is entitled to reversal because of cumulative errors in the jury instructions. Under the cumulative error doctrine, the cumulative effect of several trial errors may be prejudicial even if they would not be prejudicial when considered

21.

individually.  (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1019.)  Because we have found either no error or harmless error, we can find no cumulative error.

## DISPOSITION

The judgment is affirmed.


FRANSON, J.

WE CONCUR:


HILL, P. J.


DETJEN, J.